NEW YORK STATE DAIRY FOODS,
INC., et al., Plaintiffs,
Appellants,

v.

NORTHEAST DAIRY COMPACT
COMMISSION, et al., Defen-
dants, Appellees.

No. 98–2370.

United States Court of Appeals,
First Circuit.

Heard Sept. 13, 1999.
Decided Nov. 30, 1999.

Stuart I. Friedman, with whom Mary H. Dontzin, David O. Lloyd and Friedman, Wittenstein & Hochman, were on brief for Farmland Dairies, Inc., appellant.

Sheldon A. Weiss, for Cumberland Farms, Inc., appellant.

John J. Vetne, for New York State Dairy Foods, Inc., Crowley Foods, Inc., and Elmhurst Dairy, Inc., appellants.

Clifford M. Sloan, with whom Michael A. Rotker, Wiley, Rein & Fielding, and Dixie Henry, General Counsel, Northeast Dairy Compact Commission, were on brief for appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and LIPEZ, Circuit Judge.

BOWNES, Senior Circuit Judge.

Appellants, New York State Dairy Foods, Inc., Crowley Foods, Inc., Cumberland Farms, Inc., Elmhurst Dairy, Inc., Farmland Dairies, Inc., Stewart's Ice Cream, Inc., Stewart's Processing Corp., and Sunnyvale Farms, Inc., appeal from the district court's grant of summary judgment on their challenges to certain regulations promulgated by appellee, Northeast Dairy Compact Commission ("Commission"), with Kenneth M. Becker, executive director of the Commission.[1] Appellants argue that the Commission exceeded its regulatory power under the Northeast Interstate Dairy Compact, that it violated the Dormant Commerce Clause, and that it violated their due process rights. For reasons stated below, we affirm.

## I.  FACTS

On this appeal from the grant of summary judgment in favor of appellees, we recite the facts in the light most favorable to the appellants. *See Aponte Matos v. Toledo Davila,* 135 F.3d 182, 185 (1st Cir. 1998); *Acosta–Orozco v. Rodriguez–de–Rivera,* 132 F.3d 97, 98 (1st Cir.1997).

### A.  *The Parties*

Appellant New York State Dairy Foods, Inc. is a non-profit trade association representing New York milk processors and distributors of fluid milk products. It is joined by five fluid milk processors and distributors that procure raw milk from dairy farms outside of New England and distribute fluid milk in New England, and two New York processors that purchase raw milk from dairy farms outside of New

**1.** *See New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n,* 26 F.Supp.2d 249 (D.Mass.1998).

**4**

England but do not distribute within New England.

Appellee, the Northeast Dairy Compact Commission, administers the Northeast Interstate Dairy Compact (the "Compact"),[2] an agreement entered into by the six New England states and approved by the Congress. *See* 1996 Farm Bill, 7 U.S.C. § 7256 (1996). The Commission's primary purpose is to regulate milk prices in the signatory states.

### B. *The Compact*

Under the terms of the Compact, each state must appoint a delegation to the Compact Commission consisting of between three and five members. *See Compact* § 4. The delegation must include at least one dairy farmer and one consumer representative. *See id.* At the time this suit began, the Commission included directors of Women, Infants and Children's programs of various states, the Rhode Island Attorney General's Chief of the Consumer Protection Division, and state Agricultural Commissioners. Delegation members may not serve more than three consecutive terms, and no term may be more than four years. They may be removed from the Commission for cause. The delegation members' compensation is determined and paid by the individual states, although the Commission pays their expenses. *See Compact* § 4.

Historically, the dairy industry has been subject to extensive regulation by the federal government. Under the Agricultural Marketing Agreement Act of 1937, 50 Stat. 246, as amended, 7 U.S.C. § 601 *et seq.* (1933), the Secretary of Agriculture may set minimum prices that milk "handlers" (processors) pay to "producers" (farmers) for raw milk. These "Federal Milk Marketing Orders" vary according to class of milk; the highest prices are charged for "Class I," fluid use milk. *See generally West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 188–89 & n. 1, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (describing regulatory scheme). The primary purpose of the Compact is to set "over-order" prices in the Compact states, *i.e.*, minimum prices at some level above those mandated by the federal pricing orders. *See Compact* §§ 2(8), 9(b).

The Commission exercises broad authority, through notice and comment rulemaking, to set minimum prices that processors pay for milk distributed within the Compact region. *See Compact* §§ 8–10. Each party state has a single vote, *see Compact* § 4, and price regulations must be approved by two-thirds of all party states. A state that dissents from a price regulation is not bound by it. *See Compact* § 5.

The Commission's over-order pricing power applies to two kinds of Class I milk processors: "pool plants" and "partially regulated plants." "Pool plants" are milk plants physically located within the Compact region.[3] "Partially regulated plants" are plants that, while located outside the regulated area, distribute Class I milk within the area, or receive milk from producers in the area. The Commission's powers with respect to minimum prices for pool plants and partially regulated plants are coextensive. *See Compact* § 9(d) ("The commission is hereby empowered to establish the minimum price for milk to be paid by pool plants, partially regulated plants and all other handlers receiving milk from producers located in a regulated area.").

The terms of the Compact allow milk processors to object to the over-order price regulation. *See* Compact § 16(b). Handlers may file a written petition and

---

2. The Compact is reprinted in S.J. Res. 28, 104th Cong. (1995). We have included the resolution as an addendum to this opinion.

3. The Commission could also establish a regulation covering only a subset of the Compact states; plants within that set would be pool plants. The Compact defines "regulated area" as "any area within the region governed by and defined in regulations establishing a compact over-order price or commission marketing order." *See Compact* § 2(5).

request a hearing with the Commission. *See id.; see also* 7 C.F.R. §§ 1381.1–1381.4(f) (1997). The Chair of the Commission must appoint a hearing panel of one to three Commission members to pass on this petition. The panel must be composed of "Commission members who are not members of the state delegation in which the Handler is incorporated or has its principal place of business, who have no pecuniary interest in the outcome, and who are otherwise fair and impartial." 7 C.F.R. at § 1381.4(a). After considering the petition, the hearing panel issues a proposed decision, and, after considering handlers' objections, issues a ruling. *See id.* at §§ 1381.4(g)-(h). The Commission itself then reviews this ruling and issues its own decision. *See id.* The regulations further dictate that:

> Any commissioner shall (on either the Commissioner's own motion or on motion of the petitioner) disqualify himself or herself from consideration of the Commission's final ruling on the panel's decision if that commissioner's impartiality might reasonably be questioned.

*See id.* at § 1381.4(h)(3).

The essence of the Commission's regulatory scheme is its "pooling mechanism." All handlers, whether pool plants or partially regulated ones, pay the same amount per hundredweight (cwt) into the pool, according to the volume of Class I milk purchased.[4] *See* 7 C.F.R. § 1306.1. Thereafter, they receive rebates from the pool. While pool plants receive a rebate based on the volume of all milk sold, whether Class I, II, or III, and whether sold in the Compact region or elsewhere, partially regulated plants receive payment based solely on Class I milk distributed in the Compact region. *See* 7 C.F.R. §§ 1304.5(c)(1), 1307.4(f). These rebates are not retained by the plants, but rather are returned to the dairy farmers. *See New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 256–57 ("This money would be collected and commingled in the producer-settlement fund, along with all payment obligations of all other regulated handlers, for distribution to producers. The Commission would disburse from the pool to dairy farmers through the handlers, acting in a conduit capacity.").

It is this rebate system that appellants claim disadvantages them. Appellants claim that New York dairy farmers receive a higher payback from, and therefore prefer to conduct business with, New England pool plants.[5] This, appellants assert, causes them to suffer competitive harm.

## II. PROCEEDINGS BELOW

### A. Issuance of the Regulation

On May 30, 1997, the Commission adopted an over-order price regulation ef-

---

4. A hundredweight of milk is 100 pounds of milk, or approximately 8.3 gallons.

5. The district court offered an example of this effect that is worth repeating in its entirety:

> Plaintiffs gave the following example of the different economic impact, which the Commission does not dispute. For July 1997, the Compact over-order Class I price was $16.94, $3.00/cwt above the federal Class I price. Under Compact rules, a New York and a New England plant each having 10 million pounds (100,000 cwts) of receipts from New York Dairy Farmers, with 80% Class I use (80,000 cwts) and equal distribution of packaged milk to New England (40,000 cwts) and New York (40,000 cwts) during the month of July, would have identical over-order obligations of $120,000 to the Compact pool for packaged milk distributed in New England....
>
> The Commission would disburse from the pool to dairy farmers through the handlers, acting in a conduit capacity. The Commission calculated an "over-order producer price" (i.e., the amount to be paid back to the dairy farmers) of $1.28/cwt for July 1997. Whereas the New England pool plant would receive payment from the pool of $128,000 for redistribution to producers ... the partially regulated New York plant would receive only $51,200 for redistribution ... on some milk receipts ... thus placing the New York handler at a $76,800 competitive disadvantage.

*New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 256–57 (internal citations and footnotes omitted).

fective from July 1, 1997, to December 31, 1997. *See* 7 C.F.R. §§ 1300–08, 1381 (1997). After the requisite notice in the Federal Register and subsequent public hearings, the six member states voted unanimously in favor of the regulation. Similarly, the regulation passed the producer referendum overwhelmingly. *See* Northeast Dairy Compact Commission, Results of Producer Referendum on Compact Over–Order Price Regulation, 62 Fed. Reg. 29,646, 29,647 (May 30, 1997).

The regulation established an over-order price of $16.94 per hundredweight. *See* Compact Over-order Class I Price and Compact Over-order Obligation, 7 C.F.R. § 1305.1 (1997). At the time of adoption, the federally mandated minimum price was $13.94, resulting in an over-order obligation of $3.00 per hundredweight. As the federal Class I price increased, the over-order obligation decreased in order to keep the net price constant at $16.94 per hundredweight. The Commission applied this over-order price regulation to all Class I fluid milk distributed within the regulated area, including milk produced and processed outside the region by partially regulated plants.

The over-order price regulation included an additional assessment of $.032 per hundredweight. The Compact explicitly grants this authority to the Commission to recover its administrative costs. *See Compact* § 18(a) ("[I]f regulations establishing an over-order price or a compact marketing order are adopted, they may include an assessment for the specific purpose of their administration."). The Commission applied this assessment to all fluid milk products distributed in the regulated area, whether by pool plants or partially regulated plants. *See* 7 C.F.R. § 1308.1 (1997).

### B. *The Administrative Petitions*

On August 15, 1997, a subset of the instant appellants, led by Crowley Foods, Inc., filed administrative petitions (the "Crowley petitions") with the Commission that raised three variegated challenges, all of which are at issue in this appeal. First, they challenged the lawfulness of the pricing regulations. Second, they challenged the inclusion of a producer representative in each state's delegation to the Commission. Third, they challenged the participation on the Hearing Panel by any Commission member who had participated in promulgating the regulations under dispute. Finally, they challenged the imposition of the administrative assessments on out-of-region handlers.

In response to these challenges, the Chair of the Commission appointed three Commission members to serve as the hearing panel. The panel was comprised of the Chair, who was also the consumer representative from the Maine delegation, the Chief of the Consumer Protection Division of the Rhode Island Attorney General's Office, and the consumer representative from the New Hampshire delegation. *See New York State Dairy Foods, Inc.,* 26 F.Supp.2d at 258. As the Commission's regulations require, none of the hearing panel members were from a state in which any petitioner was incorporated or has its principal place of business. *See id.*

The panel issued a Proposed Decision on September 9, 1997, recommending that the Commission deny the claims raised. Ten days later, the petitioners filed written objections. On September 23, the panel issued its Final Proposed Decision. The Commission adopted this final proposed decision by a 6–0 vote. *See id.* The Commission held that: (1) it has the authority to regulate (by imposing an over-order price and administrative assessment on all pool and partially regulated handlers) all milk distributed in the New England region, regardless of where it is produced; (2) application of the over-order pricing and pooling regulation to partially regulated plants does not constitute an impermissible compensatory payment scheme; and (3) the participation of New England farmers and processors in setting the over-order price does not, absent specific allegations of bias, violate the Due Process

Clause. *See New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 258, citing *In re Crowley Foods, Inc.*, Nos. HEP–97–001, –002, –004 & –005, at 9–20, 24–27.

Simultaneously, appellant Elmhurst Dairy, Inc., joined by Byrne Dairy, Inc., filed its own administrative petition (the "Elmhurst petition") raising claims similar to the Crowley petitions. In addition, the Elmhurst petition claimed that the pricing regulations were unlawful as applied to Elmhurst because its distribution within the regulated area was solely through an unaffiliated distributor. The Chair of the Commission appointed the same hearing panel that heard the Crowley petitions to hear the Elmhurst petition. On October 15, 1997, the panel once again issued a proposed decision recommending that the Commission reject all claims. The Elmhurst petitioners failed to file objections, and the proposed decision became final. On December 3, 1997, the Commission, again by a 6–0 vote, adopted the panel's recommendation and rejected all claims. It specifically rejected the claim that Elmhurst was not subject to the regulation because it found that the interposition of a third-party intermediary did not change the fact that Elmhurst " 'operates a partially regulated plant that receives milk from producers providing the raw supply' for sales of packaged milk in the region." *New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 258 (citing *In re Elmhurst Dairy, Inc.*, Nos. HEP–97–007 & –008, at 8–9).

## C. *The District Court*

Both the Elmhurst and Crowley petitioners sought review in the district court, under its equity jurisdiction, to determine whether the rulings of the Commission were "in accordance with law." *New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 259. Section 16(c) of the Compact grants such authority.[6]

The district court granted summary judgment in favor of the Commission, holding that:

(1) The Commission did not violate the Commerce Clause because Congress consented to the Commission's actions. *See New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 262.

(2) The Commission's actions did not violate Condition 7 of the congressional consent. *See id.*

(3) The administrative assessment contained in the over-order price regulation was squarely authorized by the Compact. *See id.* at 263.

(4) Neither the composition of the hearing panel nor the composition of the Commission violated due process. *See id.* at 263–64.

(5) The plaintiffs were required to exhaust their administrative remedies on all claims before bringing them to the district court. *See id.* at 259.[7]

(6) The administrative assessment did not violate the Equal Protection Clause of the United States Constitution. *See id.* at 263.

(7) The Commission had authority to impose prices and assessments on Elmhurst Dairy, Inc., despite the fact that its only connection with the Compact is through an unaffiliated distributor. *See id.* at 265.

The several appellants challenge each of these rulings, save the last two, both of

---

**6.** In the course of its grant of summary judgment, the district court found that the Commission was not an "agency" subject to the provisions of the Administrative Procedure Act, 5 U.S.C. § 551(1) (1998). Appellants do not challenge this ruling.

**7.** Appellants challenge the district court's ruling on this point, arguing that the court erred in declining to accept extra-record evidence of competitive harm. We decline to reach the issue, as we concur with the district court that "none of the extra-record materials concerning the severity of any competitive harm appears [sic] relevant to the legal issues raised." *New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 259.

which appear to have been abandoned on appeal.

In addition, the district court entered an order approving an escrow account, in which any producer price payment from plaintiff-appellants would be deposited. *See New York State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, No. 97–11576–PBS (D.Mass. Aug.14, 1997) (order approving escrow of funds).

## III. STANDARD OF REVIEW

■ Our review of the district court's decision is *de novo*. *See Siegal v. American Honda Motor Co.*, 921 F.2d 15, 17 (1st Cir.1990). This is equally true of both the due process claims, *see Dominique v. Weld*, 73 F.3d 1156, 1158 (1st Cir.1996), and questions of statutory interpretation. *See United States v. George Hyman Constr. Co.*, 131 F.3d 28, 31 (1st Cir.1997) ("We review *de novo* questions of statutory interpretation that present pure questions of law.").

## IV. COMMERCE CLAUSE

■ Appellants launch a frontal assault on the over-order pricing regime (with its attendant pooling mechanism and administrative assessment) based on the Commerce Clause, or more precisely, on the so-called "Dormant Commerce Clause." *See* U.S. Const. art. I § 8; *South–Central Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 97, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984); *United Egg Producers v. Department of Agric.*, 77 F.3d 567, 569–70 (1st Cir.1996) ("The Supreme Court has interpreted this affirmative grant of authority to Congress as also establishing what has come to be called the Dormant Commerce Clause—a self-executing limitation on state authority to enact laws imposing substantial burdens on interstate commerce even in the absence of Congressional action.").

■ Appellants' claim is based on the indisputable truism that "[s]tate laws discriminating against interstate commerce are virtually *per se* invalid." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 331, 116 S.Ct. 848, 133 L.Ed.2d 796 (1996) (internal quotation marks omitted). As the Supreme Court wrote in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 527, 55 S.Ct. 497, 79 L.Ed. 1032 (1935):

> Neither the power to tax nor the police power may be used by the state of destination with the aim and effect of establishing an economic barrier against competition with the products of another state or the labor of its residents. Restrictions so contrived are an unreasonable clog upon the mobility of commerce. They set up what is equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin.

Despite this seeming foundation of bedrock, appellants' Commerce Clause challenge is ultimately based on little more than shifting sand. This case, as distinct from *Baldwin* and the more recent *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 114 S.Ct. 2205, 129 L.Ed.2d 157 (1994) (striking down state milk pricing scheme as a violation of Commerce Clause), involves an affirmative congressional consent.

There can be no dispute in this case that Congress expressly consented to the Compact. *See* Northeast Interstate Dairy Compact, 7 U.S.C. § 7256 (1996) ("Congress hereby consents to the Northeast Interstate Dairy Compact ....") (hereinafter "the consent"). The question at issue is the scope of this consent.

### A. Congressional Consent in General

■ Congress undoubtedly has the power to regulate milk prices, *see West Lynn Creamery*, 512 U.S. at 192, 114 S.Ct. 2205 ("The Commerce Clause vests Congress with ample power to enact legislation providing for the regulation of prices paid to farmers for their products"), and can grant that power to the states, *see Northeast Bancorp v. Board of Governors*, 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112

(1985) ("When Congress so chooses, state actions which it plainly authorizes are invulnerable to constitutional attack under the Commerce Clause."). The relevant initial question, then, is not whether the Compact violates the Commerce Clause. Instead, the starting point of the inquiry is whether Congress consented to the actions of the Commission. We hold that Congress has provided such consent.

■ The standard for finding congressional consent is high. Such consent must be either "expressly stated," *Sporhase v. Nebraska ex rel. Douglas*, 458 U.S. 941, 960, 102 S.Ct. 3456, 73 L.Ed.2d 1254 (1982), or "made unmistakably clear," *South–Central*, 467 U.S. at 91, 104 S.Ct. 2237. *See also United Egg Producers*, 77 F.3d at 570 (quoting both *Sporhase* and *South–Central*). The statute or legislative history relied on as consent must "evince[ ] a congressional intent to alter the limits of state power otherwise imposed by the Commerce Clause." *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341, 102 S.Ct. 1096, 71 L.Ed.2d 188 (1982) (internal quotation marks omitted). The burden of showing consent lies with the Commission. *See Wyoming v. Oklahoma*, 502 U.S. 437, 458, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (imposing burden on discriminating state).

We are called, then, to decide whether Congress's consent grants the Commission the power to undertake the regulatory action at issue in this case. Because the consent altering the limits imposed by the Commerce Clause must be clear, our inquiry is limited to determining whether Congress spoke "directly ... to the precise issue in question." *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

We have previously held that, in conducting this inquiry, "courts must look primarily to the plain meaning of the statute, drawing its essence from the particular statutory language at issue, as well as the language and design of the statute as a whole." *Strickland v. Commissioner, Maine Dept. of Human Services*, 48 F.3d 12, 16 (1st Cir.1995) (internal quotation marks omitted). With this in mind, we consider appellants' specific claims seriatim.

### 1. Congressional Consent to Regulation of Handlers Outside the Region

Appellants first argue that the Compact and its attendant consent allows the Commission to regulate only those handlers who receive milk produced within the Compact region. We do not agree. The Compact specifically authorizes the Commission to regulate the "pricing and pooling of milk handled by partially regulated plants." *Compact* § 10(7). Under the terms of the Compact, a partially regulated plant is one that is not located within the regulated area but distributes Class I milk within such area, or receives milk from producers within the area. *See Compact* § 2(7). The Compact further provides that "[t]he Commission is hereby empowered to establish the minimum price for milk to be paid by pool plants, partially regulated plants and all other handlers receiving milk from producers located in a regulated area." *Compact* § 9(d).

■ Appellants seize on this last provision, arguing that the lack of a serial comma after "partially regulated plants" and before "and all other handlers" suggests that the latter modifies the former. In other words, appellants contend that the Commission may only establish a minimum price for milk handled by a partially regulated plant when it receives milk from producers located within the regulated area. The district court rejected this argument, noting that "[s]uch an interpretation would exempt from regulation those plants that meet the first half of the disjunctive definition of a partially regulated plant in section 2(7) of the Compact." *See New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 261. The district court found

this construction to be contrary to the logic of the Compact, and we agree. Failure to construe the statute in this way would leave a gaping hole in the regulatory regime. *See United States v. Carroll,* 105 F.3d 740, 744 (1st Cir.1997) ("Wherever possible, statutes should be construed in a commonsense manner, honoring plain meaning, and avoiding absurd or counter-intuitive results.") (internal citations omitted).

### 2. *Condition 7*

Appellants' better argument is based on Condition 7 of the congressional consent, which states: "The Compact Commission shall not use compensatory payments under section 10(6) of the Compact as a barrier to the entry of milk into the Compact region or for any other purpose." 7 U.S.C. § 7256(7) (1996). Appellants urge that the pooling mechanism utilized by the Commission in its over-order pricing regulation amounts to a compensatory payment, thus violating the congressional consent. The linchpin of this argument is that because the differential payments paid back to producers (through the handlers) depend on whether the handlers are pool plants, the pooling mechanism is in effect a subsidy and compensatory payment which is a barrier to the entry of milk into the Compact region.[8]

■ Congress's command that "[t]he Compact Commission shall not use compensatory payments under section 10(6) of the Compact as a barrier to the entry of milk into the Compact region or for any other purpose" is not all Congress had to say on the matter. The next sentence states: "Establishment of a Compact over-order price, in itself, shall not be considered a compensatory payment or a limitation or prohibition in the marketing of milk." 7 U.S.C. § 7256(7). The Commission rightly urges that these two sentences read together mean that the Commission may do virtually anything (within the contemplation of the Compact) with respect to over-order pricing, short of compensatory payments.

■ Both the Commission and the district court distinguished between compensatory payments and pool payments. The former involves a system not unlike the pool method at issue in the instant case, save one crucial factor: under a compensatory payment system, the partially regulated plants would receive no disbursements whatsoever from the pool. *See* 7 C.F.R. §§ 1304.5(c)(1), 1307.4(f). This distinction is vital, because it eliminates the primary objection to compensatory payments. A compensatory payment system forces handlers outside the pool to pay what amounts to a tariff upon entry into the regulated area. *See Lehigh Valley Co-op. Farmers, Inc. v. United States,* 370 U.S. 76, 83–90, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962) (striking down a compensatory payment system and describing the above as the primary purpose and effect of a compensatory payment system); *see also New York State Dairy Foods, Inc.,* 26 F.Supp.2d at 262 n. 10 ("This description is consistent with the use of the term 'compensatory payment' in the case law cited by the plaintiffs.")(citing *Lehigh Valley Co-op. Farmers, Inc.,* 370 U.S. at 82, 82 S.Ct. 1168, and *Farmland Dairies v. McGuire,* 789 F.Supp. 1243, 1247–48 (S.D.N.Y.1992)). The pool payment mechanism, on the other hand, does not bar the entry of milk from outside the Compact region. Rather, by allowing for payments back to the out-of-compact producers for Class I milk distributed inside the Compact region, the over-order price could be said to encourage the entry of such milk.

Admittedly, pool plants and partially regulated plants are not treated with absolute similitude; while pool plants receive a rebate based on the volume of all milk sold, whether Class I, II, or III, and whether sold in the Compact region or elsewhere, partially regulated plants receive payment based only on Class I milk

---

**8.** *See supra* note 5.

distributed in the Compact region.. *See* 7 C.F.R. §§ 1304.5(c)(1), 1307.4(f).[9]

Even if there were to be some effect on entry of outside milk or some competitive disadvantage, the fact remains that Congress barred only the peculiar regulatory device of compensatory payments. From the language of the Compact, it appears that Congress distinguished between compensatory payments under § 10(6), which Congress barred, and "pricing and pooling of milk" under § 10(7), which Congress allowed.

We are left to conclude that Congress's language on the authority of the Commission to regulate via the pooling mechanism is clear. Admittedly, Congress could have outlined the very regime the Commission implemented and approved it explicitly. Congress's failure to do so, however, does not render its intent ambiguous. Cognizant of its inability to foresee every possible regulatory action, Congress chose to prohibit one action and allow all others.

### 3. *Administrative Assessment*

■ Appellants next argue that the Commission exceeded its authority (and therefore the scope of consent) by imposing an administrative assessment on all handlers distributing Class I milk in New England regardless of the point of origin of the milk. *See* 7 C.F.R. § 1308.1. We also reject this contention. The Compact explicitly gives the Commission the authority to include an administrative assessment as part of an over-order price regulation. *See* Compact § 18(a) ("[I]f regulations establishing an over-order price or a compact marketing order are adopted, they may include an assessment for the specific purpose of their administration."). Because the Commission's over-order pricing authority extends to partially-regulated plants, its assessment authority does as well.

### B. *Finding of Consent*

■ Because we hold that in all respects the Commission acted pursuant to the terms of the congressional consent, we determine next whether that consent meets the high standard mandated by the Constitution.[10] *See Sporhase,* 458 U.S. at 960, 102 S.Ct. 3456 (must be "expressly stated"); *South–Central,* 467 U.S. at 91, 104 S.Ct. 2237 (must be "made unmistakably clear"). The failure of Congress to expressly state that the Commission may take the challenged actions is not fatal. As the Supreme Court stated in *South–Central:*

> There is no talismanic significance to the phrase "expressly stated," however; it merely states one way of meeting the requirement that for a state regulation to be removed from the reach of the dormant Commerce Clause, congressional intent must be unmistakably clear. The requirement that Congress affirma-

---

**9.** To the extent that the appellants claim that the preference for pool plants violates the Equal Protection Clause, the district court deemed this claim inadequately raised. *See New York State Dairy Foods, Inc.,* 26 F.Supp.2d at 263 n. 11. For that reason, we refuse to review it here. *See Teamsters, Chauffeurs, Warehousemen and Helpers Union, Local No. 59 v. Superline Transp. Co.,* 953 F.2d 17, 21 (1st Cir.1992) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal."). While we recognize that our decision in *National Ass'n of Social Workers v. Harwood,* 69 F.3d 622, 627–29 (1st Cir.1995), allows this Court the discretion to hear claims

not raised below, we believe that this discretion is best used sparingly. There is simply too little to recommend this case as sufficiently exceptional to justify a departure from our long-standing raise-or-waive rule. *See id.* at 627 (describing this Court's adherence to the rule as "near-religious fervor").

**10.** Appellant Farmland Dairies argues that the Commission also violated Condition 2 of the Consent by regulating milk other than Class I milk. *See* 7 U.S.C. § 7256(2) (1996). Appellant admits that this point was not raised in the motion for summary judgment, but urges consideration of it nonetheless. *See* Appellant Farmland Dairies' Brief at 42 n. 10. We decline to do so. *See supra* note 9.

tively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine.

*South–Central,* 467 U.S. at 91–92, 104 S.Ct. 2237.

In the instant case, there is no question that Congress affirmatively contemplated otherwise invalid state legislation. Congress explicitly consented to the Compact, marking in Condition 7 the boundaries of the Commission's power. This demonstrates conclusively that Congress read the Compact, and rejected one possible exercise of power, thereby approving the others contained therein.

This Court's decision in *United Egg Producers v. Department of Agriculture,* 77 F.3d 567 (1st Cir.1996), is not inconsistent with our holding today. In that case, we considered a regulation by the Commonwealth of Puerto Rico that all eggs imported into Puerto Rico from the mainland United States bear a stamp showing the two-letter postal code of the state of origin. *See id.* at 569. Puerto Rico argued that Congress had consented to its action by stating: "[N]o State or local jurisdiction other than those in noncontiguous areas of the United States may require labeling to show the State or other geographical area of production or origin." 21 U.S.C. § 1052(b)(2), *as quoted in United Egg Producers,* 77 F.3d at 569. In considering whether this met the high standard of consent to state regulation of interstate commerce, we reasoned:

> One can argue that as Congress had before it the whole subject of egg-label-

ing, its exemption of noncontiguous jurisdictions must be understood to signify, by implication, Congressional approval of any and all egg-labeling requirements in those places regardless whether justified or unjustified by Dormant Commerce Clause considerations. But this seems to us a more extreme reading than either the statutory language or legislative history necessitates. Absent, at least, an affirmatively stated grant of permission to noncontiguous jurisdictions of the United States to require egg-labeling, we are unable to conclude that appellants have met their burden of showing that Congress' intent to allow Puerto Rico to enact protectionist egg-labeling regulations was "unmistakably clear."

*United Egg Producers,* 77 F.3d at 570–71 (footnotes omitted).

This case is fundamentally different. This is not a case in which an "affirmatively stated grant of permission" is lacking. Undoubtedly in part due to the peculiar nature of this case as one involving both the Dormant Commerce Clause and the Compacts Clause,[11] Congress has provided affirmative consent; Congress read the Compact and approved it.[12] *See Central Midwest Interstate Low–Level Radioactive Waste Com'n v. Pena,* 113 F.3d 1468, 1470 (7th Cir.1997) (assuming that ratification of an interstate compact by Congress obviated the need for Dormant Commerce Clause scrutiny). Accordingly, *United Egg Producers,* while instructive, is not precisely apposite.[13]

---

11. U.S. Const. art. I § 10, cl. 3 ("No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State. . . .").

12. The states of Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Rhode Island and Vermont, as amici, offer a similar argument. They argue that when an interstate compact becomes federal law under the Compacts Clause, it becomes immune from a Dormant Commerce Clause challenge by its very nature. They argue that the act of Congressional consent essentially

transforms the States' agreement into federal law. Because we affirm on other grounds, we need not reach the merits of the Compacts Clause argument.

13. Because we hold herein that Congress provided adequate consent to the Compact, we need not consider whether appellants were required to exhaust their administrative remedies before proceeding in the district court. The district court held that they were, and thus refused to hear evidence not in the administrative record documenting competitive harm to appellants. But as a result of our

## V. DUE PROCESS

Appellants urge that the composition of both the Commission and the Hearing Panel violates the Due Process Clauses of both the Fifth and Fourteenth Amendments. They argue that the commissioners who are dairy farmers or handlers have a pecuniary interest in ruling and legislating against them.

### A. In General

■ The Supreme Court has long held that a "fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). This basic requirement applies in the context of administrative agencies. *See Gibson v. Berryhill,* 411 U.S. 564, 579, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

■ When an adjudicator has a direct, personal, and substantial pecuniary interest in the outcome of a case, due process is abrogated. *See Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927). Not every interest, however, is substantial enough to amount to a violation of due process. In one formulation, an interest is substantial if it "would offer a possible temptation to the average ... judge to ... lead him not to hold the balance nice, clear and true...." *Ward v. Village of Monroeville,* 409 U.S. 57, 60, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972); *see also Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 822, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). Participation of adjudicators who "might conceivably have had a slight pecuniary interest," however, does not offend due process. *See Aetna Life Ins. Co.,* 475 U.S. at 825, 106 S.Ct. 1580.

■ The Due Process Clause sets a significantly lower bar for legislative func-

tions. *Compare Londoner v. Denver,* 210 U.S. 373, 28 S.Ct. 708, 52 L.Ed. 1103 (1908), *with Bi–Metallic Inv. Co. v. State Bd. of Equalization,* 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372 (1915); *see also Concerned Citizens of Southern Ohio, Inc. v. Pine Creek Conservancy Dist.,* 429 U.S. 651, 657, 97 S.Ct. 828, 51 L.Ed.2d 116 (1977) (Rehnquist, J., dissenting) ("As Mr. Justice Holmes recognized, the determination of legislative facts does not necessarily implicate the same considerations as does the determination of adjudicative facts.").

### B. Legislative Functions

In *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979), the Supreme Court considered a challenge to a statute establishing the Texas Optometry Board. Like the Commission, the Board was comprised of a pre-determined number of industry representatives. Four of the six members were so-called "professional opticians," and the remaining two slots were available to be filled by "commercial opticians." *See id.* at 6, 99 S.Ct. 887. The plaintiff, a commercial optician, challenged the regulation of his profession by a board whose membership (professional opticians) stood to gain directly by placing onerous restrictions on practice by their competitors. The Court rejected this claim, stating: "Although Rogers has no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry, he does have a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him by the Board." *Id.* at 18, 99 S.Ct. 887. Finding the latter right not implicated, the Court upheld the statute.

■ Industry representation on regulatory boards is a common and accepted

holding with respect to the Commerce Clause, no showing of harm could revive the Commerce Clause challenge.

practice. *See id.* at 18, 99 S.Ct. 887 (upholding such a scheme); *Stivers v. Pierce,* 71 F.3d 732, 743 (9th Cir.1995) ("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."); *Abramson v. Gonzalez,* 949 F.2d 1567, 1579 (11th Cir.1992).

■ *Friedman* involved a statutory scheme that posed a far greater danger to due process than the one we are faced with here. In that case, a "schism," *Friedman,* 440 U.S. at 5, 99 S.Ct. 887, had arisen between commercial and professional opticians, and the professional opticians were, under the statutory scheme at issue, given significant power over their occupational rivals, *see id.* at 3–6, 99 S.Ct. 887. Despite this, the Supreme Court found no violation of the Due Process Clause. Accordingly, we are unable to hold that the composition of the Commission, without more, violates due process by allowing handlers and processors from Compact states to participate in the regulatory process. Not only has the Supreme Court approved a more problematic regulatory regime in *Friedman,* but we are not convinced that, given the significant attenuation of the commissioners' potential financial gain, their interest rises to the level of substantiality required by *Tumey* and its progeny.[14]

## C. *Adjudicative Functions*

■ The Due Process Clause inquiry is slightly more complicated with respect to the Hearing Panel. This is not, in contrast to the issuance of regulations, a mere legislative function. The Hearing Panel sits as a quasi-judicial adjudicative body, and thus must comport with a higher standard of due process.

The Hearing Panel meets this standard for four reasons. First, any potential financial interest on the part of individual panel members is highly attenuated. *See Aetna Life Ins. Co.,* 475 U.S. at 825, 106 S.Ct. 1580 ("slight pecuniary interest" on the part of the adjudicator does not violate due process). In order to "lead him not to hold the balance nice, clear and true[,]" *Ward,* 409 U.S. at 60, 93 S.Ct. 80, a panel member would have to be swayed by his own pro rata share in the additional profits (assuming that there are any) of a relatively tiny proportion of the Compact milk receipts. Partially regulated plants actually ship precious little milk into the region. *See* Compact Over–Order Price Regulation, 62 Fed.Reg. 23,039 (April 28, 1997) ("At present, approximately 98 percent of the fluid milk products consumed in the region are produced by fluid processing plants located in New England."). *See also* Joint Appendix at 160; *In re Petitions of Crowley Foods, Inc. Stewart's Processing Corp., Farmland Dairies, Inc., and Cumberland Farms, Inc.,* Nos. HEP–97–001, 002, 004, and 005, Final Decision of the Commission at 2, ¶ 5 ("Petitioners, in aggregate, supply approximately three percent of all packaged, Class I, fluid milk sales in the regulated area of the six New England states.").

The Ninth Circuit has commented on an arguably analogous situation. The court stated:

A lawyer in a one-lawyer town, for example, would probably have a "direct" and "substantial" pecuniary interest in the licensing of a competitor planning to hang a shingle across the street. On the other hand, it is unlikely that any attorney practicing in a city like Los Angeles would have a competitive interest sufficiently strong to require that he be disqualified from considering the licensing of an additional lawyer.

*Stivers,* 71 F.3d at 743. We agree with the Ninth Circuit that at some level of attenuation, as here, the adjudicator's in-

14. *See infra* Part V.C.

terest becomes too remote to have a constitutionally deficient effect.

Second, the Commission's own regulations provide a due process safeguard, placing stringent restrictions on the composition of hearing panels. The regulations state:

(a) *Appointment of Commission hearing panel.* Upon receipt of a petition, the Chair shall appoint from one to three Commission members who shall consider the petition.... The Commission panel chosen by the Chair shall consist of Commission members who are not members of the state delegation in which the Handler is incorporated or has its principal place of business, who have no pecuniary interest in the outcome, and who are otherwise fair and impartial.

Conduct of Proceedings, 7 C.F.R. § 1381.4(a). Pursuant to this, the Hearing Panel which heard appellants' petitions before the Commission did not include any handlers or farmers. As noted above, the Hearing Panel in this case consisted of the Commission Chair, who was also the consumer representative from the Maine delegation, the Chief of the Consumer Protection Division of the Rhode Island Attorney General's Office, and the consumer representative from the New Hampshire delegation. *See New York State Dairy Foods, Inc.*, 26 F.Supp.2d at 258. Given the composition of the Hearing Panel in this case, it will take more than bare allegations to give rise to a finding of a deprivation of due process. We recognize that the composition of the hearing panel does not fully answer appellants' complaint about the composition of the Commission as a whole. It is true that handlers and producers sit on the Commission, and as a result both issue initial regulations and pass on the Hearing Panel's proposed decisions. The

issuance of regulations, as we have said, involves a lower due process bar. With respect to the final decision on the Hearing Panel's proposed decision, however, we need do little more than note that the full Commission adopted the proposed decision of this (unquestionably, we believe) disinterested panel.

Third, the Commission members vote as state delegations, not individual members. We recognize that this alone cannot cure a due process violation. *See Cinderella Career & Finishing Schools, Inc. v. FTC*, 425 F.2d 583, 592 (D.C.Cir.1970) (one biased member of even a sizable tribunal violates due process). It is not, however, without relevance. The possibility that the small number of handlers (with their already attenuated interest) on the Commission will influence their peers sufficiently to alter a vote is significantly more remote that it would be in a scheme in which each commissioner voted individually.

Fourth, and perhaps most important, the appellants could have moved to disqualify all handlers and farmers from the Commission decision on their petitions. *See* 7 C.F.R. § 1381.4(h)(3) ("Any commissioner shall (on either the Commissioner's own motion or on motion of the petitioner) disqualify himself or herself from consideration of the Commission's final ruling on the panel's decision if that commissioner's impartiality might reasonably be questioned."). They did not do so.

Accordingly, there is no legal or factual basis for finding a due process violation.

## VI.  CONCLUSION

Finding that the Commission violated neither the Commerce Clause nor the Due Process Clauses, we *affirm* the district court's entry of summary judgment.

ADDENDUM

Calendar No. 25

104TH CONGRESS

1ST SESSION

**S.J. RES. 28**

To grant consent of Congress to
the Northeast Interstate
Dairy Compact.

IN THE SENATE OF THE
UNITED STATES

March 2 (legislative day,
February 22), 1995

Mr. Jeffords (for himself, Mr. Leahy, Ms.
Snowe, Mr. Kennedy, Mr. Cohen, Mr.
Gregg, Mr. Dodd, Mr. Smith, Mr.
Chafee, Mr. Kerry, Mr. Lieberman,
and Mr. Pell) introduced the following
joint resolution; which was read the
first time

March 6, 1995

Read the second time and placed
on the calendar

**JOINT RESOLUTION**

To grant consent of Congress to
the Northeast Interstate

Dairy Compact.

*Resolved by the Senate and House of
Representatives of the United States of
America in Congress assembled,*

**SECTION 1. CONGRESSIONAL CON-
SENT.**

(a) CONSENT OF CONGRESS.—Congress
hereby consents to the Northeast Inter-
state Dairy Compact entered into among
the States of Vermont, New Hampshire,
Maine, Connecticut, Rhode Island, and
Massachusetts, subject to the following
conditions:

(1) LIMITATION OF MANUFACTURING PRICE
REGULATION.—The compact Commission

may not regulate Class II, Class III, or
Class III–A milk used for manufacturing
purposes or any other milk, other than
Class I, or fluid milk, as defined by a
Federal milk marketing order issued un-
der section 8c of the Agricultural Ad-
justment Act (7 U.S.C. 608c), reenacted
with amendments by the Agricultural
Marketing Act of 1937 (referred to in
this titles "Federal milk marketing or-
der") unless both Houses of Congress
have first consented to and approved
such authority by a law enacted after
the date of enactment of this joint reso-
lution.

(2) ADDITIONAL STATES.—Delaware,
New Jersey, New York, Pennsylvania,
Maryland, and Virginia are the only ad-
ditional States that may join the com-
pact, individually or otherwise, if on en-
try the additional States are contiguous
to participating States and only if both
Houses of Congress have first consented
to and approved the additional States by
a law enacted after the date of the en-
actment of this joint resolution.

(3) OUT-OF-REGION PRODUCERS.—When a
compact over-order price is in effect, the
compact Commission shall pay produc-
ers whose Class I milk is pooled with
partially regulated pool plants for sale in
the compact region an over-order price
equal to the over-order price received by
producers whose Class I milk is pooled
with pool plants.

(4) REMOVING INCENTIVES FOR OVERPRO-
DUCTION.—The compact Commission
shall develop and implement a plan to
ensure that the over-order price does
not create an incentive for producers to
generate additional supplies of milk.

(5) LIMITATION ON COMMISSION PRICING
AUTHORITY.—The maximum amount of
the compact over-order price identified
in section 9(b) of the compact refers to,
and shall mean, the combined amount of
the applicable, Federal milk marketing
order Class I price plus the regulated
amount above the Federal milk market-

ing order Class I price established by the compact Commission.

(6) REGULATION OF COMPACT OVER-ORDER PRICE, ASSESSMENT ON PROCESSORS, AND DISBURSEMENT TO PRODUCERS.—The compact Commission shall administer any compact over-order price by a pooling mechanism. Compensatory payments under section 10(6) of the compact shall be utilized only when the Commission determines, on consultation with the applicable processor, that the use of the pooling mechanism would not be feasible or economical for the processor and the Commission. In making its determination, the Commission shall ensure that the utilization of compensatory payments will not create a competitive disadvantage for any processor or producer.

(7) COMPETITIVE CREDITS.—Competitive credits shall be used only in a manner consistent with their use in the Federal milk marketing orders.

(8) EFFECT ON FEDERAL MARKET ORDER CLASS I PRICE.—A compact over-order price shall have no effect on any applicable Federal milk marketing order Class I price. Any difference between or among the federally established Class I prices for milk subject to a compact over-order price shall remain unaffected by imposition of the over-order price.

(b) COMPACT.—The compact is substantially as follows:

## "ARTICLE I. STATEMENT OF PURPOSE, FINDINGS AND DECLARATION OF POLICY

### "§ 1. STATEMENT OF PURPOSE, FINDINGS AND DECLARATION OF POLICY

"The purpose of this compact is to recognize by constitutional prerequisite the interstate character of the northeast dairy industry and to form an interstate commission for the northeast region. The mission of the commission is to take such steps as are necessary to assure the continued viability of dairy farming in the northeast, and to assure consumers of an adequate, local supply of pure and wholesome milk.

"The participating states find and declare that the dairy industry is the paramount agricultural activity of the northeast. Dairy farms, and associated suppliers, marketers, processors and retailers, are an integral component of the region's economy. Their ability to provide a stable, local supply of pure, wholesome milk is a matter of great importance to the health and welfare of the region.

"The participating states further find that dairy farms are essential to the region's rural communities and character. The farms preserve open spaces, sculpt the landscape and provide the land base for a diversity of recreational pursuits. In defining the rural character of our communities and landscape, dairy farms also provide a major draw for our tourist industries.

"By entering into this compact, the participating states affirm that their ability to regulate the price which northeast dairy farmers receive for their product is essential to the public interest. Assurance of a fair and equitable price for dairy farmers ensures their ability to provide milk to the market and the vitality of the northeast dairy industry, with all the associated benefits.

"Recent, dramatic price fluctuations, with a pronounced downward trend, threaten the viability and stability of the northeast dairy region. Historically, individual state regulatory action has been an effective emergency remedy available to farmers confronting a distressed market. The federal order system, implemented by the Agricultural Marketing Agreement Act of 1937, establishes only minimum prices for dairy products, without preempting the power of states to regulate milk prices above the minimum levels so established. Based on this authority, each state in the region has individually attempted to imple-

ment at least one regulatory program in response to the current dairy industry crisis.

"In today's regional dairy marketplace, cooperative, rather than individual state action may address more effectively the market disarray. Under our constitutional system, properly authorized, states acting cooperatively may exercise more power to regulate interstate commerce than they may assert individually without such authority. For this reason, the participating states invoke their authority to act in common agreement, with the consent of Congress, under the compact clause of the Constitution.

"In establishing their constitutional regulatory authority over the region's fluid milk market by this compact, the participating states declare their purpose that this compact neither displace the federal order system nor encourage the merging of federal orders. Specific provisions of the compact itself set forth this basic principle.

"Designed as a flexible mechanism able to adjust to changes in a regulated marketplace, the compact also contains a contingency provision should the federal order system be discontinued. In that event, the interstate commission is authorized to regulate the marketplace in replacement of the order system. This contingent authority does not anticipate such a change, however, and should not be so construed. It is only provided should developments in the market other than establishment of this compact result in discontinuance of the order system.

## "ARTICLE II. DEFINITIONS AND RULES OF CONSTRUCTION

### "§ 2. DEFINITIONS

"For the purposes of this compact, and of any supplemental or concurring legislation enacted pursuant thereto, except as may be otherwise required by the context:

"(1) 'Commission' means the commission established by this compact.

"(2) 'Compact' means this interstate compact.

"(3) 'Region' means the territorial limits of the states which are or become parties to this compact.

"(4) 'Participating state' means a state which has become a party to this compact by the enactment of concurring legislation.

"(5) 'Regulated area' means any area within the region governed by and defined in regulations establishing a compact over-order price or commission marketing order.

"(6) 'Pool plant' means any milk plant located in a regulated area.

"(7) 'Partially regulated plant' means a milk plant not located in a regulated area but having Class I distribution within such area, or receipts from producers located in such area. Commission regulations may exempt plants having such distribution or receipts in amounts less than the limits defined therein.

"(8) 'Compact over-order price' means a minimum price required to be paid to producers for Class I milk established by the commission in regulations adopted pursuant to sections nine and ten of this compact, which is above the price established in federal marketing orders or by state farm price regulation in the regulated area. Such price may apply throughout the region or in any part or parts thereof as defined in the regulations of the commission.

"(9) 'Commission marketing order' means regulations adopted by the commission pursuant to sections nine and ten of this compact in place of a terminated federal marketing order or state dairy regulation. Such order may apply throughout the region or in any part or parts thereof as defined in the regulations of the commission. Such order may establish minimum prices for any or all classes of milk.

"(10) 'Milk' means the lacteal secretion of cows and includes all skim, butterfat, or other constituents obtained from separation or any other process. The term is used in its broadest sense and may be further defined by the commission for regulatory purposes.

"(11) 'Class I milk' means milk disposed of in fluid form or as a fluid milk product, subject to further definition in accordance with the principles expressed in subdivision (b) of section three.

"(12) 'State dairy regulation' means any state regulation of dairy prices, and associated assessments, whether by statute, marketing order or otherwise.

## "§ 3. RULES OF CONSTRUCTION

"(a) This compact shall not be construed to displace existing federal milk marketing orders or state dairy regulation in the region but to supplement them. In the event some or all federal orders in the region are discontinued, the compact shall be construed to provide the commission the option to replace them with one or more commission marketing orders pursuant to this compact.

"(b) This compact shall be construed liberally in order to achieve the purposes and intent enunciated in section one. It is the intent of this compact to establish a basic structure by which the commission may achieve those purposes through the application, adaptation and development of the regulatory techniques historically associated with milk marketing and to afford the commission broad flexibility to devise regulatory mechanisms to achieve the purposes of this compact. In accordance with this intent, the technical terms which are associated with market order regulation and which have acquired commonly understood general meanings are not defined herein but the commission may further define the terms used in this compact and develop additional concepts and define additional terms as it may find appropriate to achieve its purposes.

## "ARTICLE III. COMMISSION ESTABLISHED

## "§ 4. COMMISSION ESTABLISHED

"There is hereby created a commission to administer the compact, composed of delegations from each state in the region. A delegation shall include not less than three nor more than five persons. Each delegation shall include at least one dairy farmer who is engaged in the production of milk at the time of appointment or reappointment, and one consumer representative. Delegation members shall be residents and voters of, and subject to such confirmation process as is provided for in, the appointing state. Delegation members shall serve no more than three consecutive terms with no single term of more than four years, and be subject to removal for cause. In all other respects, delegation members shall serve in accordance with the laws of the state represented. The compensation, if any, of the members of a state delegation shall be determined and paid by each state, but their expenses shall be paid by the commission. Each state delegation shall be entitled to one vote in the conduct of the commission's affairs.

## "§ 5. VOTING REQUIREMENTS

"All actions taken by the commission, except for the establishment or termination of an over-order price or commission marketing order, and the adoption, amendment or rescission of the commission's bylaws, shall be by majority vote of the delegations present. Establishment or termination of an over-order price or commission marketing order shall require at least a two-thirds vote of the delegations present. The establishment of a regulated area which covers all or part of a participating state shall require also the affirmative vote of that state's delegation. A majority of the delegations from the participating states shall constitute a quorum

for the conduct of the commission's business.

## "§ 6. ADMINISTRATION AND MANAGEMENT

"(a) The commission shall elect annually from among the members of the participating state delegations a chairperson, a vice-chairperson, and a treasurer. The commission shall appoint an executive director and fix his or her duties and compensation. The executive director shall serve at the pleasure of the commission, and, together with the treasurer, shall be bonded in an amount determined by the commission. The commission may establish through its by-laws an executive committee composed of one member elected by each delegation.

"(b) The commission shall adopt by-laws for the conduct of its business by a two-thirds vote, and shall have the power by the same vote to amend and rescind these by-laws. The commission shall publish its by-laws in convenient form with the appropriate agency or officer in each of the participating states. The by-laws shall provide for appropriate notice to the delegations of all commission meetings and hearings and of the business to be transacted at such meetings or hearings. Notice also shall be given to other agencies or officers of participating states as provided by the laws of those states.

"(c) The commission shall file an annual report with the Secretary of Agriculture of the United States, and with each of the participating states by submitting copies to the governor, both houses of the legislature, and the head of the state department having responsibilities for agriculture.

"(d) In addition to the powers and duties elsewhere prescribed in this compact, the commission shall have the power—

"(1) to sue and be sued in any state or federal court;

"(2) to have a seal and alter the same at pleasure;

"(3) to acquire, hold, and dispose of real and personal property by gift, purchase, lease, license, or other similar manner, for its corporate purposes;

"(4) to borrow money and to issue notes, to provide for the rights of the holders thereof and to pledge the revenue of the commission as security therefor, subject to the provisions of section eighteen of this compact;

"(5) to appoint such officers, agents, and employees as it may deem necessary, prescribe their powers, duties, and qualifications; and

"(6) to create and abolish such offices, employments, and positions as it deems necessary for the purposes of the compact and provide for the removal, term, tenure, compensation, fringe benefits, pension, and retirement rights of its officers and employees. The commission may also retain personal services on a contract basis.

## "§ 7. RULEMAKING POWER

"In addition to the power to promulgate a compact over-order price or commission marketing orders as provided by this compact, the commission is further empowered to make and enforce such additional rules and regulations as it deems necessary to implement any provisions of this compact, or to effectuate in any other respect the purposes of this compact.

## "ARTICLE IV. POWERS OF THE COMMISSION

## "§ 8. POWERS TO PROMOTE REGULATORY UNIFORMITY, SIMPLICITY, AND INTERSTATE COOPERATION

"The commission is hereby empowered to:

"(1) Investigate or provide for investigations or research projects designed to review the existing laws and regulations of the participating states, to consider

their administration and costs, to measure their impact on the production and marketing of milk and their effects on the shipment of milk and milk products within the region.

"(2) Prepare and transmit to the participating states model dairy laws and regulations dealing with the inspection of farms and plants, sanitary codes, labels for dairy products and their imitations, standards for dairy products, license standards, producer security programs, and fair trade laws.

"(3) Study and recommend to the participating states joint or cooperative programs for the administration of the dairy laws and regulations and to prepare estimates of cost savings and benefits of such programs.

"(4) Encourage the harmonious relationships between the various elements in the industry for the solution of their material problems. Conduct symposiums or conferences designed to improve industry relations, or a better understanding of problems.

"(5) Prepare and release periodic reports on activities and results of the commission's efforts to the participating states.

"(6) Review the existing marketing system for milk and milk products and recommend changes in the existing structure for assembly and distribution of milk which may assist, improve, or promote more efficient assembly and distribution of milk.

"(7) Investigate costs and charges for producing, hauling, handling, processing, distributing, selling and for all other services performed with respect to milk.

"(8) Examine current economic forces affecting producers, probable trends in production and consumption, the level of dairy farm prices in relation to costs, the financial conditions of dairy farmers, and the need for an emergency order to relieve critical conditions on dairy farms.

## "§ 9. EQUITABLE FARM PRICES

"(a) The powers granted in this section and section ten shall apply only to the establishment of a compact over-order price, so long as federal milk marketing orders remain in effect in the region. In the event that any or all such orders are terminated, this article shall authorize the commission to establish one or more commission marketing orders, as herein provided, in the region or parts thereof as defined in the order.

"(b) A compact over-order price established pursuant to this section shall apply only to Class I milk. Such over-order price shall not exceed one dollar fifty cents per gallon. Beginning in nineteen hundred ninety, and using that year as a base, the foregoing one dollar fifty cents per gallon maximum shall be adjusted annually by the rate of change in the Consumer Price Index as reported by the Bureau of Labor Statistics of the United States Department of Labor. For purposes of the pooling and equalization of an over-order price, the value of milk used in other use classifications shall be calculated at the appropriate class price established pursuant to the applicable federal order or state dairy regulation and the value of unregulated milk shall be calculated in relation to the nearest prevailing class price in accordance with and subject to such adjustments as the commission may prescribe in regulations.

"(c) A commission marketing order shall apply to all classes and uses of milk.

"(d) The commission is hereby empowered to establish the minimum price for milk to be paid by pool plants, partially regulated plants and all other handlers receiving milk from producers located in a regulated area. This price shall be established either as a compact over-order price or by one or more commission marketing orders. Whenever such a price has been established by either type of regulation, the legal obligation to pay such price shall be determined solely by the terms and purpose of the regulation without regard

to the situs of the transfer of title, possession or any other factors not related to the purposes of the regulation and this compact. Producer-handlers as defined in an applicable federal market order shall not be subject to a compact over-order price. The commission shall provide for similar treatment of producer-handlers under commission marketing orders.

"(e) In determining the price, the commission shall consider the balance between production and consumption of milk and milk products in the regulated area, the costs of production including, but not limited to the price of feed, the cost of labor including the reasonable value of the producer's own labor and management, machinery expense, and interest expense, the prevailing price for milk outside the regulated area, the purchasing power of the public and the price necessary to yield a reasonable return to the producer and distributor.

"(f) When establishing a compact over-order price, the commission shall take such action as necessary and feasible to ensure that the over-order price does not create an incentive for producers to generate additional supplies of milk.

"(g) The commission shall whenever possible enter into agreements with state or federal agencies for exchange of information or services for the purpose of reducing regulatory burden and cost of administering the compact. The commission may reimburse other agencies for the reasonable cost of providing these services.

## "§ 10. OPTIONAL PROVISIONS FOR PRICING ORDER

"Regulations establishing a compact over-order price or a commission marketing order may contain, but shall not be limited to, any of the following:

"(1) Provisions classifying milk in accordance with the form in which or purpose for which it is used, or creating a flat pricing program.

"(2) With respect to a commission marketing order only, provisions establishing or providing a method for establishing separate minimum prices for each use classification prescribed by the commission, or a single minimum price for milk purchased from producers or associations of producers.

"(3) With respect to an over-order minimum price, provisions establishing or providing a method for establishing such minimum price for Class I milk.

"(4) Provisions for establishing either an over-order price or a commission marketing order may make use of any reasonable method for establishing such price or prices including flat pricing and formula pricing. Provision may also be made for location adjustments, zone differentials and for competitive credits with respect to regulated handlers who market outside the regulated area.

"(5) Provisions for the payment to all producers and associations of producers delivering milk to all handlers of uniform prices for all milk so delivered, irrespective of the uses made of such milk by the individual handler to whom it is delivered, or for the payment of producers delivering milk to the same handler of uniform prices for all milk delivered by them.

"(A) With respect to regulations establishing a compact over-order price, the commission may establish one equalization pool within the regulated area for the sole purpose of equalizing returns to producers throughout the regulated area.

"(B) With respect to any commission marketing order, as defined in section two, subdivision nine, which replaces one or more terminated federal orders or state dairy regulation, the marketing area of now separate state or federal orders shall not be merged without the affirmative consent of each state, voting through its delegation, which is partly or wholly

included within any such new marketing area.

"(6) Provisions requiring persons who bring Class I milk into the regulated area to make compensatory payments with respect to all such milk to the extent necessary to equalize the cost of milk purchased by handlers subject to a compact over-order price or commission marketing order. No such provisions shall discriminate against milk producers outside the regulated area. The provisions for compensatory payments may require payment of the difference between the Class I price required to be paid for such milk in the state of production by a federal milk marketing order or state dairy regulation and the Class I price established by the compact over-order price or commission marketing order.

"(7) Provisions specially governing the pricing and pooling of milk handled by partially regulated plants.

"(8) Provisions requiring that the account of any person regulated under a compact over-order price shall be adjusted for any payments made to or received by such persons with respect to a producer settlement fund of any federal or state milk marketing order or other state dairy regulation within the regulated area.

"(9) Provisions requiring the payment by handlers of an assessment to cover the costs of the administration and enforcement of such order pursuant to Article VII, Section 18(a).

"(10) Provisions for reimbursement to participants of the Women, Infants and Children Special Supplemental Food Program of the United States Child Nutrition Act of 1966.

"(11) Other provisions and requirements as the commission may find are necessary or appropriate to effectuate the purposes of this compact and to provide for the payment of fair and equitable minimum prices to producers.

## "ARTICLE V. RULEMAKING PROCEDURE

## "§ 11. RULEMAKING PROCEDURE

"Before promulgation of any regulations establishing a compact over-order price or commission marketing order, including any provision with respect to milk supply under subsection 9(f), or amendment thereof, as provided in Article IV, the commission shall conduct an informal rulemaking proceeding to provide interested persons with an opportunity to present data and views. Such rulemaking proceeding shall be governed by section four of the Federal Administrative Procedure Act, as amended (5 U.S.C. § 553). In addition, the commission shall, to the extent practicable, publish notice of rulemaking proceedings in the official register of each participating state. Before the initial adoption of regulations establishing a compact over-order price or a commission marketing order and thereafter before any amendment with regard to prices or assessments, the commission shall hold a public hearing. The commission may commence a rulemaking proceeding on its own initiative or may in its sole discretion act upon the petition of any person including individual milk producers, any organization of milk producers or handlers, general farm organizations, consumer or public interest groups, and local, state or federal officials.

## "§ 12. FINDINGS AND REFERENDUM

"(a) In addition to the concise general statement of basis and purpose required by section 4(b) of the Federal Administrative Procedure Act, as amended (5 U.S.C. § 553(c)), the commission shall make findings of fact with respect to:

"(1) Whether the public interest will be served by the establishment of minimum milk prices to dairy farmers under Article IV.

"(2) What level of prices will assure that producers receive a price sufficient

to cover their costs of production and will elicit an adequate supply of milk for the inhabitants of the regulated area and for manufacturing purposes.

"(3) Whether the major provisions of the order, other than those fixing minimum milk prices, are in the public interest and are reasonably designed to achieve the purposes of the order.

"(4) Whether the terms of the proposed regional order or amendment are approved by producers as provided in section thirteen.

## "§ 13. PRODUCER REFERENDUM

"(a) For the purpose of ascertaining whether the issuance or amendment of regulations establishing a compact over-order price or a commission marketing order, including any provision with respect to milk supply under subsection 9(f), is approved by producers, the commission shall conduct a referendum among producers. The referendum shall be held in a timely manner, as determined by regulation of the commission. The terms and conditions of the proposed order or amendment shall be described by the commission in the ballot used in the conduct of the referendum, but the nature, content, or extent of such description shall not be a basis for attacking the legality of the order or any action relating thereto.

"(b) An order or amendment shall be deemed approved by producers if the commission determines that it is approved by at least two-thirds of the voting producers who, during a representative period determined by the commission, have been engaged in the production of milk the price of which would be regulated under the proposed order or amendment.

"(c) For purposes of any referendum, the commission shall consider the approval or disapproval by any cooperative association of producers, qualified under the provisions of the Act of Congress of February 18, 1922, as amended, known as the Cap-per–Volstead Act, bona fide engaged in marketing milk, or in rendering services for or advancing the interests of producers of such commodity, as the approval or disapproval of the producers who are members or stockholders in, or under contract with, such cooperative association of producers, except as provided in subdivision (1) hereof and subject to the provisions of subdivisions (2) through (5) hereof.

"(1) No cooperative which has been formed to act as a common marketing agency for both cooperatives and individual producers shall be qualified to block vote for either.

"(2) Any cooperative which is qualified to block vote shall, before submitting its approval or disapproval in any referendum, give prior written notice to each of its members as to whether and how it intends to cast its vote. The notice shall be given in a timely manner as established, and in the form prescribed, by the commission.

"(3) Any producer may obtain a ballot from the commission in order to register approval or disapproval of the proposed order.

"(4) A producer who is a member of a cooperative which has provided notice of its intent to approve or not to approve a proposed order, and who obtains a ballot and with such ballot expresses his approval or disapproval of the proposed order, shall notify the commission as to the name of the cooperative of which he or she is a member, and the commission shall remove such producer's name from the list certified by such cooperative with its corporate vote.

"(5) In order to insure that all milk producers are informed regarding a proposed order, the commission shall notify all milk producers that an order is being considered and that each producer may register his approval or disapproval with the commission either directly or through his or her cooperative.

## "§ 14. TERMINATION OF OVER–ORDER PRICE OR MARKETING ORDER

"(a) The commission shall terminate any regulations establishing an over-order price or commission marketing order issued under this article whenever it finds that such order or price obstructs or does not tend to effectuate the declared policy of this compact.

"(b) The commission shall terminate any regulations establishing an over-order price or a commission marketing order issued under this article whenever it finds that such termination is favored by a majority of the producers who, during a representative period determined by the commission, have been engaged in the production of milk the price of which is regulated by such order; but such termination shall be effective only if announced on or before such date as may be specified in such marketing agreement or order.

"(c) The termination or suspension of any order or provision thereof, shall not be considered an order within the meaning of this article and shall require no hearing, but shall comply with the requirements for informal rulemaking prescribed by section four of the Federal Administrative Procedure Act, as amended (5 U.S.C. § 553).

## "ARTICLE VI. ENFORCEMENT

## "§ 15. RECORDS, REPORTS, ACCESS TO PREMISES

"(a) The commission may by rule and regulation prescribe record keeping and reporting requirements for all regulated persons. For purposes of the administration and enforcement of this compact, the commission is authorized to examine the books and records of any regulated person relating to his or her milk business and for that purpose, the commission's properly designated officers, employees, or agents shall have full access during normal business hours to the premises and records of all regulated persons.

"(b) Information furnished to or acquired by the commission officers, employees, or its agents pursuant to this section shall be confidential and not subject to disclosure except to the extent that the commission deems disclosure to be necessary in any administrative or judicial proceeding involving the administration or enforcement of this compact, an over-order price, a compact marketing order, or other regulations of the commission. The commission may promulgate regulations further defining the confidentiality of information pursuant to this section. Nothing in this section shall be deemed to prohibit (i) the issuance of general statements based upon the reports of a number of handlers, which do not identify the information furnished by any person, or (ii) the publication by direction of the commission of the name of any person violating any regulation of the commission, together with a statement of the particular provisions violated by such person.

"(c) No officer, employee, or agent of the commission shall intentionally disclose information, by inference or otherwise, which is made confidential pursuant to this section. Any person violating the provisions of this section shall upon conviction be subject to a fine of not more than $1,000 or to imprisonment for not more than one year, or to both, and shall be removed from office. The commission shall refer any allegation of a violation of this section to the appropriate state enforcement authority or United States Attorney.

## "§ 16. SUBPOENA, HEARINGS AND JUDICIAL REVIEW

"(a) The commission is hereby authorized and empowered by its members and its properly designated officers to administer oaths and issue subpoenas throughout all signatory states to compel the attendance of witnesses and the giving of testimony and the production of other evidence.

"(b) Any handler subject to an order may file a written petition with the commission stating that any such order or any provision of any such order or any obligation imposed in connection therewith is not in accordance with law and praying for a modification thereof or to be exempted therefrom. He shall thereupon be given an opportunity for a hearing upon such petition, in accordance with regulations made by the commission. After such hearing, the commission shall make a ruling upon the prayer of such petition which shall be final, if in accordance with law.

"(c) The district courts of the United States in any district in which such handler is an inhabitant, or has his principal place of business, are hereby vested with jurisdiction in equity to review such ruling, provided a bill in equity for that purpose is filed within thirty days from the date of the entry of such ruling. Service of process in such proceedings may be had upon the commission by delivering to it a copy of the bill of complaint. If the court determines that such ruling is not in accordance with law, it shall remand such proceedings to the commission with directions either (1) to make such ruling as the court shall determine to be in accordance with law, or (2) to take such further proceedings as, in its opinion, the law requires. The pendency of proceedings instituted pursuant to this subdivision shall not impede, hinder, or delay the commission from obtaining relief pursuant to section seventeen. Any proceedings brought pursuant to section seventeen (except where brought by way of counterclaim in proceedings instituted pursuant to this section) shall abate whenever a final decree has been rendered in proceedings between the same parties, and covering the same subject matter, instituted pursuant to this section.

## "§ 17. ENFORCEMENT WITH RESPECT TO HANDLERS ·

"(a) Any violation by a handler of the provisions of regulations establishing an over-order price or a commission marketing order, or other regulations adopted pursuant to this compact shall:

"(1) Constitute a violation of the laws of each of the signatory states. Such violation shall render the violator subject to a civil penalty in an amount as may be prescribed by the laws of each of the participating states, recoverable in any state or federal court of competent jurisdiction. Each day such violation continues shall constitute a separate violation.

"(2) Constitute grounds for the revocation of license or permit to engage in the milk business under the applicable laws of the participating states.

"(b) With respect to handlers, the commission shall enforce the provisions of this compact, regulations establishing an over-order price, a commission marketing order or other regulations adopted hereunder by:

"(1) Commencing an action for legal or equitable relief brought in the name of the commission in any state or federal court of competent jurisdiction; or

"(2) With the agreement of the appropriate state agency of a participating state, by referral to the state agency for enforcement by judicial or administrative remedy.

"(c) With respect to handlers, the commission may bring an action for injunction to enforce the provisions of this compact or the order or regulations adopted thereunder without being compelled to allege or prove that an adequate remedy of law does not exist.

## "ARTICLE VII. FINANCE

## "§ 18. FINANCE OF START–UP AND REGULAR COSTS

"(a) To provide for its start-up costs, the commission may borrow money pursuant to its general power under section six, subdivision (d), paragraph four. In order

to finance the costs of administration and enforcement of this compact, including payback of start-up costs, the commission is hereby empowered to collect an assessment from each handler who purchases milk from producers within the region. If imposed, this assessment shall be collected on a monthly basis for up to one year from the date the commission convenes, in an amount not to exceed one-tenth of one percent of the applicable federal market order blend price per hundred weight of milk purchased from producers during the period of the assessment. The initial assessment may apply to the projected purchases of handlers for the two-month period following the date the commission convenes. In addition, if regulations establishing an over-order price or a compact marketing order are adopted, they may include an assessment for the specific purpose of their administration. These regulations shall provide for establishment of a reserve for the commission's ongoing operating expenses.

"(b) The commission shall not pledge the credit of any participating state or of the United States. Notes issued by the commission and all other financial obligations incurred by it, shall be its sole responsibility and no participating state or the United States shall be liable therefor.

## "§ 19.  AUDIT AND ACCOUNTS

"(a) The commission shall keep accurate accounts of all receipts and disbursements, which shall be subject to the audit and accounting procedures established under its rules. In addition, all receipts and disbursements of funds handled by the commission shall be audited yearly by a qualified public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

"(b) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the participating states and by any persons authorized by the commission.

"(c) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any participating state or of the United States.

## "ARTICLE VIII.  ENTRY INTO FORCE; ADDITIONAL MEMBERS AND WITHDRAWAL

## "§ 20.  ENTRY INTO FORCE; ADDITIONAL MEMBERS

"The compact shall enter into force effective when enacted into law by any three states of the group of states composed of Connecticut, Delaware, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, Vermont, and Virginia, and when the consent of Congress has been obtained. This compact shall also be open to states which are contiguous to any of the named states and open to states which are contiguous to participating states.

## "§ 21.  WITHDRAWAL FROM COMPACT

"Any participating state may withdraw from this compact by enacting a statute repealing the same, but no such withdrawal shall take effect until one year after notice in writing of the withdrawal is given to the commission and the governors of all other participating states. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

## "§ 22.  SEVERABILITY

"If any part or provision of this compact is adjudged invalid by any court, such judgment shall be confined in its operation to the part or provision directly involved in the controversy in which such judgment shall have been rendered and shall not affect or impair the validity of the remainder of this compact."Congress reserves the

right to amend or rescind this interstate compact at any time."

## SEC. 2.  RESERVATION OF RIGHTS.

(a) IN GENERAL.—The right to alter, amend, or repeal this Act is expressly reserved.

(b) COMPENSATION REQUIREMENT.—When an over-order price is in effect, the Commission established in this compact shall compensate the Commodity Credit Corporation before the end of the fiscal year for the cost of any increased Commodity Credit Corporation dairy purchases that result from projected increased fluid milk production for that fiscal year within the Compact region in excess of the national average rate of increase.

SJ 28 PCS—2

SJ 28 PCS—3

SJ 28 PCS—4